# Wytheville.

## REYNOLDS v. REYNOLDS' EX'OR.

### July 2d, 1891.

1. BILLS OF REVIEW—*Decree of Appellate Court.*—Upon discovery of evidence, material and sufficient to change the decree of court below and of this court, which plaintiff never knew of before, and could not have known of by due diligence, a bill of review may be filed in the court below whereon such decree may be reviewed, and corrected or reversed.

2. IDEM—*After-discovered evidence—Case at bar.*—An undivided half of tract of land was sold in gross. A survey was made, which so laid off said "half" as to include 102 acres less than the parties estimated the half to contain, and said "half" was conveyed to vendee. A decree was rendered in court below for the unpaid purchase-money, which decree was affirmed by this court on appeal. Later, vendee filed in court below a bill to review said decree, setting-up that he had, since the affirmance, discovered evidence that the fraudulent conduct of the surveyor, in so laying off said "half," had produced in the vendor as well as in the vendee a mutual mistake as to the area of said "half," under which mistake the conveyance was made and accepted; and that he did not know of, and by reasonable diligence could not have known of, such evidence before;

HELD:

The after-discovered evidence set-up in said bill of review entitled the vendee to the relief prayed for.

Appeal from final decree of circuit court of Floyd county, rendered September 19th, 1887, on a bill of review filed by the appellant, Harvey A. Reynolds, by leave of the court, in the original cause therein pending, wherein Stephen Watts, in his own right, and as executor of Charles B. Reynolds, deceased,

was complainant, and Harvey A. Reynolds was defendant. The bill of review was dismissed, and said Harvey A. Reynolds appealed.   Opinion states the case.

*J. L. Tompkins* and *A. A. Phlegar*, for appellant

*George E. Dennis*, for appellee.

FAUNTLEROY, J., delivered the opinion of the court.

A transcript of the record of the said bill of review, and a transcript of the record of the original cause in which the said bill of review was filed, show the following case : In September, 1882, Stephen Watts, as executor of Charles B. Reynolds, deceased, and in his own right, filed his original bill in the circuit court of Floyd county, against Harvey A. Reynolds, charging that the said Harvey A. Reynolds was indebted to C. B. Reynolds, deceased, in the sum of $1,600, due by four bonds filed with the bill, of $400 each, for unpaid purchase-money for land sold and conveyed by said Charles B. Reynolds, in 1869, to the said Harvey A. Reynolds, for which a vendor's lien was reserved in the deed filed with the bill, which he prayed to enforce.

Harvey A. Reynolds answered the bill, setting out that he had bought of Charles B. Reynolds in 1869, thirty or forty acres of a tract of " *Wiley* " land and *one-half* of the " *Guer-rant* " land, owned by the said C. B. Reynolds, for $5,000 ; and had paid all of the said purchase-money except the four bonds filed with the bill; that no lines or boundaries for the division of the *Guerrant* land were pointed out, mentioned, fixed or agreed to at the time of the said sale in 1869; and that it was not divided, and no division was marked across it, until 1872, when Charles B. Reynolds instructed a surveyor, Stephen Guerrant, to lay off to Harvey A. Reynolds, one-half of the Guerrant land, telling him that he had sold to him *one-half* of

the said tract of Guerrant land; that the said surveyor, Stephen Guerrant reported to the said C. B. Reynolds that he had laid off by boundaries in a deed which he had prepared, one-half of the said land to the said Harvey A. Reynolds, and that the said boundaries in the said deed mentioned did embrace one-half of the said Guerrant tract of land; that this deed, prepared by the said Stephen Guerrant, was executed and delivered by Charles B. Reynolds, and accepted by the said Harvey A. Reynolds, in absolute and undoubted faith in the integrity and competency of the said Stephen Guerrant, entertained at that time by both the said grantor and grantee in the said deed. That the truth was only revealed by a survey ordered and made in the original cause in 1884; that the boundaries specified in the said deed did not embrace and did not convey to the said Harvey A. Reynolds *one-half* of the Guerrant land, by a deficiency of 102 acres, for which large deficiency the said defendant prayed for an equitable abatement of the purchase-money.

The court below, by its decree of May, 1884, was of opinion that the contract between C. B. Reynolds and Harvey A. Reynolds was a *contract of hazard* according to the boundaries in the deed, and refused to allow any abatement of the purchase-money on account of the loss of 102 acres less than one-half of the Guerrant land. From this decree of the circuit court of Floyd county, an appeal was allowed to this court; and this court, by its decree of June 25th, 1885, affirmed the said decree of the circuit court of Floyd. After the cause went back to the court below for further proceedings, and the land of appellant was sold under the decree of May, 1884, but the purchase-money not collected, the defendant, Harvey A. Reynolds, at the November term, 1886, by leave of the said circuit court of Floyd county, filed his bill of review in the cause, founded upon after-discovered evidence, material and sufficient to change the decrees of the circuit court and of this court, and which he never knew of before, and could not have known

of by due diligence.  Watts answered this bill, and evidence was taken on both sides; whereupon, the circuit court, by its decree of September 19th, 1887, refused to correct its decree of May, 1884, and the decree of this court of June 25th, 1885, and dismissed the bill of review.

The case is here upon appeal from this decree, and the question presented for the decision of this court now is, Did the circuit court err in denying the relief prayed for in the bill of review, and in dismissing the bill?

In the case of *Connolly* v. *Connolly and others*, 32 Gratt., Judge Burks delivered the opinion of this court, in which, after stating the requisites of a bill of review based upon the ground of after-discovered evidence, it is decided that " a bill founded on after-discovered evidence, with the requisites just stated, may be filed to review a decree even after it has been affirmed by an appellate court."  Citing *J. B. Campbell's Executors* v. *A. C. Campbell's Executors*, 22 Gratt., and cases cited; *Singleton* v. *Singleton and others*, 8 B. Monroe.  In the case of *Campbell's Executors* v. *Campbell's Executors, supra*, Moncure, P., delivered the opinion of this court, in which it is said, on page 673, " That a decree of the Court of Appeals, which has been certified to and entered as the decree of the court below, may be reviewed and, corrected, or reversed, on a bill of review filed in the latter court, founded on new matter, seems to be true."  *  *  "But while it is no doubt true that a bill of review may be allowed in such a case,  *  *  * the new matter, to be sufficient ground for the reversal of the decree, ought to be very material and newly-discovered and unknown to the party seeking relief at the time the decree was rendered, and such as he could not then have discovered by the use of reasonable diligence.  This is necessary even in an ordinary case of a bill of review of a decree of the same court in which the bill is filed on the ground of new matter.  *A fortiori*, it must be necessary when the object is to reverse a decree of the Court of Appeals, in favor of the finality of

which there are so many reasons founded on. public policy
and convenience."

Upon the pleadings and proofs in the original cause the
question was whether C. B. Reynolds had sold to Harvey A.
Reynolds *one-half* of the Guerrant tract of land, or only so
much thereof as was embraced in the boundaries of the deed.
The circuit court decreed that the boundaries in the deed
which was accepted by Harvey A. Reynolds, made it a contract
of hazard and a sale in gross, and this construction was
affirmed by the decree of this court upon the record then pre-
sented.   The counsel for the appellees, commenting upon the
newly-discovered ·testimony presented by the bill of review,
asks, "Would it have produced a different result on the first
trial, or is it of a different character and kind from that taken
on the first trial to overthrow the words of the deed from C.
B. Reynolds to Harvey Reynolds?" We answer this question
with an emphatic affirmative.   All the characteristics of after-
discovered evidence as a basis of a bill of review, obtain in the
evidence presented by the record now under review; it was
discovered after the decree was rendered in the circuit court,
and after it was affirmed by this court; it could not have been
discovered before by the exercise of reasonable diligence; it
is material, and such as, if true, ought to produce on the trial
of the issue a different result, and one in consonance with the
demands of justice; and it is not *merely* cumulative.   It con-
sists of the full, clear, and positive testimony of the Rev.
James M. Price, Captain William P. Thompson, Mr. M. G.
Angel, and Mr. Aaron Beckner, all highly respectable white
men of Franklin county, the life-long friends and neighbors
of C. B. Reynolds, who all swear that the facts within their
knowledge were never made known by them to Harvey A.
Reynolds until after the decision of the case in the Supreme
Court of Appeals, and the discussion in the neighborhood
about the suit and the sale of Harvey A. Reynolds' land to

satisfy the decree against him. And neither of these gentlemen testified in the original cause.

The evidence in the record shows that C. B. Reynolds was a wealthy land-owner in Franklin and Floyd counties, who had no wife or children or descendants living; that Harvey A. Reynolds, who had been his former slave and, up to his death in 1875, his trusted friend and business manager, was an illiterate but industrious, thrifty, and worthy colored man, between whom and C. B. Reynolds there existed kindness, affection, and perfect confidence. In January, 1869, C. B. Reynolds sold to Harvey A. Reynolds, upon long time and easy terms, *one-half* of his Peter Guerrant tract of land in Floyd county, with thirty acres of his Wiley tract adjoining, for $5,000. At the time of the said sale it was not known how many acres were contained in the Guerrant tract, and the evidence is clear and conclusive that the boundaries of the land sold, simply by the designation of *one-half* of the Guerrant tract, were not then named, referred to or fixed, nor was even any division line indicated or agreed upon. More than *two* years after, to-wit, in February, 1882, C. B. Reynolds instructed Stephen Guerrant, a surveyor, to go upon the land and survey and lay off one-half of the Guerrant land to Harvey A. Reynolds, to whom, he told the said Stephen Guerrant, he had sold it. Guerrant reported to C. B. Reynolds that he had surveyed and laid off one-half the Guerrant tract, and that the lines or boundaries indicated and expressed in the deed which he prepared would give to Harvey A. Reynolds *one-half* of the Guerrant tract. This he expressly said and assured to Harvey A. Reynolds, who, under that information and belief, accepted the deed, which C. B. Reynolds had executed under the same information and belief in the competency and integrity of the said Stephen Guerrant, surveyor. A mutual mistake, into which both the grantor and grantee in the said deed were deceived by the statements and misrepresentations made by the said Stephen Guerrant, who had, as the event and the evi-

dence fully disclose, designedly so expressed the boundaries in the deed as to convey to the said Harvey A. Reynolds *less than one-half* of the Guerrant tract, by a deficiency of 102 acres—nearly *one-fourth* of what he was entitled to.

This mistake, or, more accurately speaking, this *imposition*, upon both C. B. Reynolds and Harvey A. Reynolds, was never known or discovered by either C. B. Reynolds or Harvey A. Reynolds until C. B. Reynolds sold the residue *one-half* of his Guerrant tract to one W. H. Poff, who refused to buy it except by the acre, and C. B. Reynolds had it surveyed by the said Stephen Guerrant and found that it contained 562 acres. This disclosure of the fact that the deed which he had made to Harvey A. Reynolds, as prepared by Stephen Guerrant, did not convey to him one-half of the Guerrant tract greatly surprised and distressed him; and he expressed, openly and frequently, his purpose to repair the injustice done to Harvey A. Reynolds; but which he did not do because of extreme ill-health, suffering, and death away from his home, in Lynchburg, whither he had gone for treatment.

It will not be possible to extend in this opinion, without swelling it to unnecessary length, all the evidence, newly-discovered, and presented under the bill of review; but the testimony of W. P. Thompson (which is only a sample of the others) will fully expose the action and *motive* of the fraud and abuse of confidence practiced by Stephen Guerrant upon both the grantor and grantee in the deed which he imposed upon them; and of which he subsequently took his own advantage. W. P. Thompson says: "I knew Charles B. Reynolds for many years, in fact from my childhood, until he went to Lynchburg in 1875, where he died. When I first knew him he lived in Floyd county. About the year 1842 he fixed his residence in Franklin county, in my immediate neighborhood, where he remained until shortly before his death. Before the war he was a man of large property, consisting mostly of land and slaves; and even after the war he had a good estate.

After he removed to Franklin I visited and saw him fre-
quently, and he talked with me familiarly. He lived for years
before his death by himself, his wife and children having been
dead for years. About the year 1869 or 1870 he told me, in
the course of conversation, that he had sold one-half of a tract
of land which he owned in Floyd, called the Guerrant place,
estimated to contain about 800 acres, to Harvey Reynolds, a
former slave of his. I asked him if he did not think that this
was too large a contract for a person in Harvey's condition to
carry out. He replied that he thought not; that Harvey was
an industrious, energetic man; and that he had so arranged the
payments that he thought he would be able to meet them.
Again, during the year 1875, and but a short time before Mr.
Reynolds went to Lynchburg, I fell in company with him, and
we talked for some time. In the course of the conversation,
Mr. Reynolds adverted to and dwelt at some length on a con-
troversy which he had nearly had with one Stephen Guerrant.
He went on to say that not long previously one Poff had pro-
posed to purchase from him the part of his Guerrant tract in
Floyd county, left to him after his previous sale of *one-half* to
Harvey Reynolds. That he had offered to sell it to Poff at
400 acres in the lump, as he had originally purchased the tract
at 800 acres, and had sold only one-half to H. Reynolds; but
that Poff would only buy by the acre, and required that a sur-
vey should be made to ascertain the number of acres, and that
he accordingly made the sale to Poff in this way. He said he
spoke to Stephen Guerrant to make the survey. That he had
sometime before got Guerrant to cut off one-half of the said
tract to Harvey Reynolds; and under the belief and assurance
that he had done so properly, he had conveyed the land to
Harvey, who was under the same belief. He said he told
Guerrant of his attempt to sell the land to Poff at 400 acres,
and he was satisfied that it contained that much; but that
Poff had refused to take it at that. That Guerrant thereupon
offered to guarantee that it would hold out 400 acres, if he

(Mr. Reynolds) *would agree to let him have all over that amount.*
That he consented to do this; and upon Guerrant's suggestion
this agreement was reduced to writing. That Guerrant there-
upon made a survey of the land, and reported that the original
tract contained more than 900 acres instead of 800 acres; and
that the part left to him contained greatly more than 400 acres;
while the part he had conveyed to Harvey Reynolds by deed
based upon the reported representations of Guerrant, and
which he thought was one-half of the tract, was many acres
less than half. He said that Guerrant had sued him on his
contract for a large amount, the value of the land in excess of
400 acres; and that he had been compelled to compromise the
matter by paying him $300. He spoke very bitterly about the
manner in which Guerrant had acted; said he had fraudu-
lently misled him and Harvey Reynolds into making a deed
which conveyed far less than one-half of the land; when it
was his intention to convey Harvey, and he thought he had
conveyed him the *full half* which he had contracted to sell
him; and that he had only become aware of this mistake and
injustice to Harvey after Guerrant made his report of the sur-
vey of the land sold to Poff."

The testimony of the three other after-discovered witnesses is
as full and clear, and as positive and direct, on all points, as that
of the witness, W. P. Thompson, above detailed; and they all
say that C. B. Reynolds expressed his surprise and indignation
at the fraud practiced upon both him and Harvey Reynolds by
Stephen Guerrant, and asseverate his desire and purpose to
redress the injustice done to Harvey Reynolds, by giving him
credit for the value of the land he did not get, upon his pur-
chase-money bonds. That having sold the land to Poff, this
was the only way in which he could correct the wrong.

We are of opinion that the after-discovered evidence, which
was before the circuit court under the bill of review, entitled
the appellant, Harvey A. Reynolds, to the relief prayed for in
his bill; and that the decree of the said court, of the 19th of

September, 1887, appealed from, is wholly erroneous, and must be reversed and annulled; and the order of this court is to send the cause back to the circuit court of Floyd county, with instructions to re-instate the bill of review, and to enter a decree reversing the decree of that court, entered at the May term, 1884, and the decree of affirmance of that decree by this court at the June term (25th day), 1885, and granting the relief prayed for in the bill of review.

LACY, J. (dissenting), said:

This is the same case which was decided at the June term of this court, 1885, under the name of *Reynolds* v. *Watts, etc.*, Watts being the executor of Charles B. Reynolds, deceased; the appellee then and the appellee now. The case as it is stated in the opinion of the court at that term is as follows:

" LACY, J. This is an appeal from a decree of the circuit court of Floyd county, rendered at the May term, 1884. In October, 1882, the appellee Watts, executor of Charles B. Reynolds, deceased, instituted this suit against the appellant, seeking to charge the lands of the appellant with the payment of the residue of the purchase-money due and unpaid thereon to the said Charles B. Reynolds, deceased. The said land having been sold to the said appellant by the said Reynolds, deceased, a lien was retained in the deed to secure the payment of the purchase-money unpaid, being evidenced by the four bonds of the purchaser, two of which had been assigned to the appellee, Watts, and two of which were due to the estate of the said Charles B. Reynolds, deceased. The appellant answered, setting forth that the land had been purchased in 1869, and that the unpaid purchase-money claimed in the bill had never been paid, but that he was entitled to an abatement in the purchase-money because of a falling off in the quantity of land of one hundred and fifty-five acres, which, at $11.19 per acre, would be $1,734. That the bonds sued for only

amounted to $1,600 in the aggregate, upon one of which a credit of $81 appeared; and that the estate of Chas. B. Reynolds was indebted to him for overpayment in the sum of $215; and filed set-offs in addition to the amount of $500 and $31.09, without interest, and asked for a decree against the estate of Chas. B. Reynolds. That Chas. B. Reynolds had sold to him one-half of what was known as his 'Guerrant Land,' which contained eight hundred and fifteen acres, from which four acres had been sold off. That he was thus entitled to have over four hundred acres of this land; and that subsequently he had bought of Chas. B. Reynolds another tract of land of one hundred and fifty-four acres, out of the other half of the Guerrant land, at $7.50 per acre. The deeds in question, and the other deeds conveying other portions of the Guerrant land, are exhibited, and the testimony of numerous witnesses filed in the record. The land was surveyed, and the report of a commissioner filed to whom it had been referred for an account of the purchase-money remaining unpaid, etc. And on the first day of May, 1884, a decree was rendered in the cause, in which the circuit court, allowing the offsets claimed and proved, decreed against the appellant for the balance due to the estate of Chas. B. Reynolds, deceased, and for the balance due on the assigned bonds, and held the same to be a charge upon the land, and decreed a sale of the land to pay the same, unless the said appellant should pay the said balance within ninety days from the rising of the court, and refused to make any deduction for the alleged loss of land. From this decree an appeal was allowed to this court. There are no disputed questions of law in the case, the principle upon which the case must be decided being well settled and conceded on both sides.

"The whole case depends on the disputed question of fact as to whether the sale of the land was a sale in gross, and in so far a contract of hazard,—that is, a tract of land within designated boundaries, as to which a falling short in quantity will be no ground for relief,—or whether it was a sale of land

at gross price, upon estimate of quantity influencing price, when a mistake has occurred, which if understood, would probably have prevented the sale, or varied its terms, which, upon well-settled principles, would have been ground for relief in equity. The appellant claims to have bought one-half of the Guerrant land—about 400 acres—and thirty acres of another tract in 1869, boundary to be afterwards ascertained; that in 1872 line was run, deed made, and bonds executed, the price in gross being $5,000; that he was put in possession of the land at once, and so remained. His vendor died in 1876, and this suit, as has been said, was instituted in October, 1882. The last bond fell due in January, 1882, when, four bonds remaining unpaid, suit was instituted in the month of October of that year. The deed by which this land was conveyed described it 'as a certain tract of land containing a supposed boundary of three hundred and fifty acres, be the same more or less, and bounded as follows,' setting out the boundary lines with great minuteness, giving courses and distances, with the words added, ' it being about one-half of the said C. B. Reynolds Guerrant land,' and to the deed was appended this memorandum : ' N. B. All the land is sold in the boundaries except four acres, which was sold to I Huff, before this deed was made.' It is clear from the evidence that at the time this sale was made the Guerrant land had not been surveyed, and was only known by the boundaries. Soon after the land not sold to appellant was surveyed, and turned out to contain 563 acres. This fact was then known to the appellant, and yet he never said anything about having bought by the acre, or with reference to the number of acres, until the vendor was dead—indeed, had been dead six years—and not until suit was brought to compel payment of the unpaid purchase-money. And, although the land conveyed to appellant as about half of the Guerrant tract, contained, in accordance with the contract, thirty or forty·acres of the Wiley tract, no mention whatever

is made of the thirty or forty acres in the deed, but the two pieces are conveyed together, without distinction by metes and bounds, as included within a boundary containing 350 acres, more or less. If only bought as one-half of the Guerrant tract, why was this thirty or forty acres included? The evidence shows that, while the original agreement was for these two pieces of land, there was no deed made until the line was run and the boundaries laid off. The sale was for the gross sum of $5,000 for this marked and designated tract of land, and there was not a word said about the price per acre, and where the quantity is mentioned it is as 350 acres, more or less, within certain boundaries. There is no ground to suppose that the sale was other than a sale in gross of a designated piece of land at an agreed price. The estimation of the quantity, so far as it went, was made by both parties, upon the same facts, which were equally known to both. The vendor did not take upon himself to make any affirmation or representations in respect to quantity. The vendee knew as much about the land as the vendor, having resided upon it, and known it just as long. The vendor spoke his real opinion, founded upon the very same information which his vendee had, and in which the latter concurred with him, without being influenced by it, so far as the evidence shows. The vendor concealed no fact within his knowledge which could in any degree influence the opinion. The sale was a sale in gross, within unascertained boundaries, and consummated without a survey, by mutual agreement— was a contract of hazard, without any fraud, concealment, misrepresentation, or negligence on the part of the vendor. The error in the quantity, if there was any such, was mutual, and was not in relation to the substance of the thing contracted for, but in relation to the very hazard contemplated by the parties—a contract in which the purchaser took the risk of quantity upon himself. This court has uniformly recognized the validity and obligation of such a contract, and in all cases where relief has been given, it has been founded on circum-

stances either of fraud, misrepresentation, or concealment, or mistake, in whole or in part, as to the substance of the thing contracted for.

" It is not deemed necessary to review the evidence in detail. It is immaterial whether the reference to the one-half part of the Guerrant land in the deed is as to quantity or as to value in this case. It is sufficiently clear from the deed and the admitted facts that the sale was for the land within certain boundaries, uninfluenced by the estimate in the deed; that it was a contract for a sale in gross; and a contract of hazard. And the circuit court of Floyd having so held in the decree complained of, the same must be affirmed."

At this hearing one of the judges of this court dissented in the following language, which states his views at that time :

" I dissent from the opinion which has just been read. In my judgment, the decree appealed from is plainly wrong, and ought to be reversed. I think it fails to give effect to the intention of the parties, and in consequence does great injustice to the appellant here. That parol evidence is admissible in cases like the present to explain the true understanding of the parties is not only well established, but undisputed. As was said by this court in *Mauzy* v. *Sellars*, 26 Gratt. 641 : ' That it is competent for a court of equity to correct a mistake in a deed or other writing upon parol evidence cannot now be questioned. No branch of equity jurisdiction is more fully established than this : none is sustained by a greater array of authorities, English and American.' The application of this principle to the present case leaves no room for doubt in my judgment that the decree should be reversed. The bill was filed to enforce a vendor's lien on the defendant's land, and the single question is whether the latter is entitled to an abatement of the purchase-money as claimed in his answer. The original contract to convey the land was by parol. The deed was executed several years thereafter. That at the time the contract of sale was entered into neither party knew the exact

quantity of land in respect of which they were contracting there can be no doubt. The Guerrant land, of which the land he sold to the appellant was a part, had not then been conveyed to the vendor, but was supposed to contain about 800 acres. The deed to the latter, subsequently made, describes it as containing about 815 acres; and to my mind the evidence is conclusive that the parties contracted with reference to about one-half of that tract of land. Then, did the deed to the appellant convey the land for which he contracted? If it did not, then clearly we have here presented the ordinary case of a mutual mistake, which calls for correction in a court of equity. But what says the deed? It purports to convey 'a certain tract of land containing a supposed boundary of 350 acres, be the same more or less.' But it does not stop here. It gives the boundaries, as best the parties could, and then concludes as follows: 'It being about one-half of the said C. B. Reynolds' part of the Guerrant tract.' Now, if these two statements of the deed are conflicting, then upon the familiar rule of construction that must be taken which is most strongly against the grantor. In point of fact, the deed conveyed, as was afterwards ascertained, less than one-half of Reynolds' part of the Guerrant tract by 102 acres, and this the appellant contends is contrary to the intention of both parties to that instrument. In support of this contention many witnesses were examined, whose testimony is unimpeached; and if their statements are to be taken as true, as I think they must be, then the case of the appellant is established beyond a doubt. The witness, Enoch Reynolds, testifies that he was present when the contract was made, and heard the conversation between the parties. It was agreed, he says, that the appellant was to pay $5,000, and was to have one-half of Reynolds' part of the Guerrant tract, and thirty-five or forty acres of the Wiley tract; and he further says that Reynolds, the vendor, expressed the belief that his part of the Guerrant tract contained about 800 acres. After the land to the appellant was

sold, the residue of the tract was sold by Reynolds to one Charles Craig; and the latter testified that Reynolds represented to him that he had sold one-half of the tract to the appellant. Subsequently the land thus sold to Craig was again acquired by Reynolds, who offered to sell it to various persons as containing 400 acres, and at a much less sum than he obtained for the land he had sold the appellant. The witness, Robert P. Craig, testifies that he repeatedly heard Reynolds say that he had sold the appellant one-half of his part of the Guerrant land. And to the same effect is the testimony of other witnesses. The witness, Buckner, testifies that, in a conversation with Reynolds, after the sale to the appellant, he informed him that he had instructed the surveyor to run off to the appellant all the Guerrant land but 400 acres. And various witnesses testify that after the sale to the appellant Reynolds offered to sell to them the residue of the tract, and represented it to contain 400 acres. ˙ I am at a loss to imagine how stronger evidence than this could be adduced to show the real intention of the parties in respect to the transaction in question, when taken in connection with the expressed object of the deed to convey ' about one-half of Reynolds' part of the Guerrant tract.' In opposition to this testimony are the depositions of four witnesses, one of whom is Mrs. Mary Jack, and another, Charles W. Aldridge. These witnesses testify to vague and loose conversations with the appellant, and admissions by him, which at the most are entitled to little weight, if any at all, as against the clear and positive evidence which was taken for the appellant. It appears, moreover, that Mrs. Jack and Aldridge are the wife and step-son, respectively, of one John O. Jack, who, apart from his hostility to the appellant, appears in no enviable light in the present controversy, if the uncontradicted testimony is to be taken as true. The witness, S. L. Walton, testifies that in a conversation with Jack, while the depositions in the suit were being taken, the latter said to him that if he (Jack) and his wife and her son (Aldridge)

were summoned, Harvey Reynolds (the appellant) would be thrown; and further said that they 'might make some money, probably a hundred or two,' if Mr. Watts, the plaintiff, were informed, and would summon them. Prudently enough Jack himself was not summoned, and I deem it unnecessary to further comment upon the testimony of his wife and her son, who were.

"Now, in view of the language of the deed, already quoted, construed, as it must be, in the light of the parol evidence in the case, I cannot hesitate to say that, in my judgment, this appellant, whom the record shows to be an ignorant, old, colored man, of exceptional merit, and who, in the life-time of his 'old master,' the appellee's testator, was the object of his confidence and affection, and but for whose death this controversy most probably would never have arisen, has been most greviously wronged by the decree complained of. By that decree, now affirmed by this court, he is required to pay the sum of nearly $2,000, or, in default thereof, his land to be sold, when, according to the evidence in the case, and the well-established law of this state, as I understand it, he justly owes not one cent. A late case on the subject is *Yost* v. *Mallicote's Adm'r*, 77 Va. 610. In that case the vendee purchased and took a deed for a tract of land within certain metes and bounds, which was verbally represented to contain a certain number of acres, and probably more. Afterwards it was ascertained that the quantity of land within the boundaries was less than had thus been represented. It was held, upon the evidence in that case, that the vendee was entitled to an abatement of the purchase-money on the ground of mistake, although judgments on the bonds for the purchase-money had been obtained at law. The present case, it seems to me, is equally strong for the appellant. The contract was entered into for the purchase of about one-half of the Guerrant land, as shown by the deed itself and the evidence of the witnesses. It is not denied that the land fell short more than 100 acres of

that quantity. It is equally certain that the price contracted to be paid was an adequate consideration for the one-half of the tract the appellant supposed he was buying, and therefore a much larger sum than the quantity of land he actually got was worth. Why, then, should he not be entitled to an abatement of the purchase-money when summoned to answer in a court of equity.? The deed says that he was to have about one-half of the land. Three witnesses heard the vendor say he had sold him one-half of the land, and five witnesses (all white men) heard him say, after the sale was made, that he had but 400 acres left; and the evidence shows that he actually agreed to give all over 400 acres in the residue of the tract to the man who would insure that it contained as much as 400 acres. The fact is that, owing to the mistake of the parties, it really contained 562 acres. And the result is that the vendor not only retained more than 100 acres of land justly belonging to the appellant, but that now his executor, under what seems to me a mistaken view of the law and the facts of the case, is decreed to be entitled to recover a large sum of money besides. I had omitted to refer to the memorandum at the end of the deed, to which much weight seems to be attached in the opinion of the court. Its object and effect was simply to exclude from the operation of the conveyance four acres of the land which had previously been sold to another party, and nothing more. Its language is as follows : ' All the land is sold in the boundaries except four acres, which was sold to I. Huff before this deed was made.' And that this is the correct view is conclusively shown, I think, not only by the evidence already referred to, but by the deposition of a witness who says the vendor informed him that the land had cost the appellant about $12 per acre. I have thus, in great haste and very imperfectly, expressed my views in this case. I have endeavored to present it fairly and impartially, and am satisfied that the case, as shown by the record, is even stronger for the appellant than I have presented it. But

enough has been said, I think, to show that the decree is erroneous and ought to be reversed."

After the rendition of this decision a rehearing was applied for and refused by this court. Subsequently a bill of review was filed in the circuit court of Floyd county, having for its object a review and reversal of the decree of the said court above-mentioned, and the decree of this court affirming the same. The ground was newly-discovered evidence, which could not with reasonable diligence have been discovered by the plaintiff in said bill before the first trial, to the effect that C. B. Reynolds "had admitted on four different occasions, to four different persons, just precisely what your orator contended for in the original clause, to-wit: that he sold your orator in 1869 the Wiley land, and one-half the Peter Guerrant tract for $5,000; that C. B. Reynolds found out that he had made a mistake and intended to correct it; that these facts, within the knowledge of Rev. James M. Price, Captain William P. Thompson, Mr. M. J. Angell, and Mr. Aaron Beckner, all highly respected white men of Franklin county, and friends and neighbors of Mr. C. B. Reynolds, never became known to plaintiff till decision of case in Supreme Court of Appeals." Alleging further that "plaintiff knew nothing of these admissions, and there was nothing to suggest itself to him before trial to go to said witnesses, or either of them, and ask them of such admissions, or whether they had any knowledge of said case." What this newly-discovered evidence was is set forth in the opinion of the majority, *ante*, page 155, to some extent as to the testimony of Captain William P. Thompson. "He [C. B. Reynolds] told me that he had sold one-half of a tract of land which he owned in Floyd, called the 'Guerrant Place,' estimated to contain about 800 acres, to Harvey Reynolds, a former slave of his." This in 1869 or 1870. In 1875 he fell in with him, and he dwelt some time on a controversy he had with Guerrant. On cross-examination this witness was asked: "Didn't Harvey go to see you

when he was first sued by Reynolds, executor, about the matter in controversy in this suit?" He answered: "I don't remember that he did. He might have said something to me on that subject." He was also asked, if, in giving his answers to questions asked by plaintiff's counsel, he did not copy from a memorandum in writing, which he had before him; and he answered: "Yes; that memorandum was made after due reflection." The witness Angell says: "He [C. B. Reynolds] told me he had sold half of the Guerrant tract of land to Harvey Reynolds. I don't think he said at what time. That he had employed Stephen Guerrant to survey one-half to Harvey Reynolds, and in the survey he had fallen short a large number of acres of giving him one-half." The old man, Charles B. Reynolds, went on to say that Harvey Reynolds owed him a considerable amount, and this survey being short, it would make him safe in the deferred payments. The witness Price says that Mr. Reynolds had told him that said plaintiff had complained to him about not getting the number of acres, and that he could not make it up to Harvey then; that the land had been sold, and he was going to pay him back, etc. It was proved in the cause that the plaintiff lived in the neighborhood of these new witnesses, and when he was hunting evidence before the first trial he went to the house of the newly-discovered witness, Thompson. The appellee, Watts, testified that he had talked with the plaintiff, Harvey Reynolds, about these bonds during the life-time of C. B. Reynolds, and he never heard any claim as to any deficiency in this land until after the death of C. B. Reynolds; and numerous witnesses testify that they talked with C. B. Reynolds about this land sold to Harvey Reynolds, and never heard from him a suggestion that Harvey Reynolds was in any way dissatisfied with his purchase; and, indeed, that the sale to Harvey was so liberal in terms that it amounted to a rental of ten years and then a gift of the land.

There are filed fifteen letters, written by Harvey Reynolds to

C. B. Reynolds in his life-time, and to J. R. Reynolds acting for him, and to Watts, his executor, after his death, in which this indebtedness is the topic, and in which he sets forth in detail his offsets against this debt, and promises payment, they being applied, and for years begs indulgence, pleading poor crops, and hard work, and yet not one word is said about any falling short in the number of acres, nor one word of any dissatisfaction as to the contract of purchase. I am satisfied that this defence now set up is an afterthought conceived only after the death of Charles B. Reynolds; and this record demonstrates that, if sooner conceived, it was never disclosed until Charles B. Reynolds' lips had been closed by death. Harvey Reynolds bought a part of two tracts of land by metes and bounds, and agreed to pay a sum agreed on, which had no reference whatever to the number of acres nor to the question whether it was half or less than half of the Guerrant land; and, indeed, it was not all a part of the Guerrant land, but was in part made up out of the Wiley tract. But, in any event, according to the heretofore unbroken line of decisions of this court on this subject, the bill of review was properly dismissed by the learned judge of the circuit court. The evidence was merely cumulative, and was just as well known to the purchaser before the first trial, as said. That it was cumulative only the first record abundantly shows. From what has gone before concerning this bill of review, it appears that the newly-discovered evidence was to the effect that C. B. Reynolds had sold to Harvey Reynolds, his former slave, one-half of the lands belonging to him known as the "Guerrant Land," and that Harvey Reynolds did not get this. In the first record it appears that at the first trial the witness Enoch Reynolds testified that C. B. Reynolds had admitted that he had sold to Harvey "half of Reynolds' part of the Guerrant tract." Charles Craig said, in answer to the question, "Did you hear Mr. C. B. Reynolds say how much of the Guerrant land he had sold to Harvey Reynolds?"—"Well, sir, I never heard him say how many

acres, but that he had sold to Harvey Reynolds half of the Guerrant land." The witness Price says : " Mr. Reynolds told me Guerrant had made a mistake; that he only claimed 400 acres." The witness, Marshall Reynolds, says in reply to the question, " State what you heard Mr. Reynolds tell Mr. Armistead Burwell about what part of the Guerrant land he had sold to Harvey Reynolds,"—" I heard him tell Mr. Armistead Burwell that he sold half of his part of the Guerrant land to Harvey Reynolds." The witness Robert. Craig says : " I have often heard him say that he had sold to Harvey Reynolds half of his part of the Guerrant land."

What is the law upon the subject of new trials to be granted upon the ground of new evidence ? It has been often stated thus: (1) The evidence must have been discovered since the trial. (2) It must be evidence that could not have been discovered before the trial by the plaintiff or defendant, as the case may be, by the exercise of reasonable diligence. (3) It must be material in its object, and such as ought on another trial to produce an opposite result on the merits. (4) It must not be merely cumulative, corroborative or collateral. Opinion of Burks, J., in *Wynne* v. *Newman*, 75 Va. 817; 4 Minor, Inst., Part. I, pp. 758, 579, and cases cited; *St. John's Ex'ors* v. *Alderson*, 32 Gratt. 140, 143. Judge Burks says in *Wynne* v. *Newman*, *supra :* " Evidence newly discovered is said to be cumulative in its relation to the evidence on the trial when it is of the same kind and character ; " citing Chief Justice Savage as saying in *People* v. *Superior Court*, 10 Wend. 285, 294 : " According to my understanding of cumulative evidence, it means additional evidence to support the same point, which is of the same character with evidence already produced." The evidence introduced to sustain the bill of review was cumulative only, a large number of witnesses had testified to the same thing on the former trial. At both trials it was stated by witnesses for Harvey Reynolds that C. B. Reynolds had in his life-time said these things ; but

during his life-time, and after he had assigned some of these bonds, neither to him nor to his assignee would Harvey Reynolds assert any such thing; but, although pressed hard for this money, he never hinted at such a defence, but wrote many letters, admitting his liability, and begging for time.   Yet he did not then know, or, if he knew, he did not then state any such defence, although the other half of the Guerrant land had been surveyed and sold to others under his eyes, and had amounted to a good many acres more than he had gotten by his actual survey and deed.   And even when he was urging his offsets and payments, and having them allowed to him, he did not claim this, nor make any hint of any such deficiency. I think the case was decided rightly by the circuit court on both trials, and by this court on the first hearing here, six years ago, and that the decision at this hearing cannot be sustained upon any sound principle.   I therefore dissent from the opinion of the majority.

Decree reversed.